UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHRISTINE DEFRANCESCO,

                  Plaintiff,

      -against-

MIRADOR REAL ESTATE, LLC,

                Defendant.

**Docket No.:**
**1:18-cv-4032 (VSB)**

### DECLARATION OF MICHAEL R. MINKOFF, ESQ.  IN OPPOSITION TO DEFENDANT'S TWO MOTIONS FOR SANCTIONS AGAINST BORRELLI & ASSOCIATES, P.L.L.C. AND UNDERSIGNED COUNSEL

I, Michael R. Minkoff, Esq., an attorney duly admitted to practice in this Court, pursuant to 28 U.S.C. 1746, declare under the penalty of perjury the following:

1.      I am an associate with Borrelli & Associates, P.L.L.C. ("Firm"), and am an attorney admitted to the Bar of this Court.  In this now *dismissed* wage and hour matter, *see* ECF #s 36, 39 the Firm previously represented Plaintiff Christine DeFrancesco ("Plaintiff") until November 9, 2018, when the Court granted the Firm's motion to be relieved as Plaintiff's counsel of record (ECF # 26).

2.      As Plaintiff's former counsel, I am familiar with the facts and circumstances discussed herein based upon personal knowledge and the files maintained by the Firm.

3.      I submit this declaration in opposition to Defendant Mirador Real Estate, LLC ("Defendant")'s **two** motions for sanctions against both the Firm and undersigned counsel, individually, pursuant to this Court's March 14, 2019 Endorsed Order (ECF # 36), to provide a detailed accounting of all relevant background information, context, and evidence clearly establishing that both of Defendant's motions utterly lack any merit.  This declaration is also

1

submitted in support of our Firm's request for attorneys' fees and costs incurred having to oppose this motion pursuant to Rule 11(c)(2).

4.      The vast majority of the facts contained herein were originally submitted to this Court through the Firm's November 2, 2018 *ex parte* submission in connection with its motion to withdraw.  We now submit this declaration - - with exhibits - - on the public docket pursuant to our right to do so through Rule 1.6(b)(5)(i) of the New York Rules of Professional Conduct ("RPC"), to combat Defendant's accusations of bad faith and improper conduct against both the Firm and undersigned counsel.

5.      We respectfully submit that the information below and the evidence attached hereto make it abundantly clear that our Firm did not engage in any wrongdoing - - neither undersigned counsel specifically nor the Firm generally - - let alone anything close to sanctionable behavior.[1]

6.      Plaintiff initially consulted with the Firm by meeting with undersigned counsel at the Firm's Manhattan office on December 27, 2017.  As part of that initial consultation, prior to speaking with me, Plaintiff completed an intake questionnaire, which the Firm provides to all consulting individuals as a matter of course.  One of the many questions provided on that intake asks whether the consulting individual has ever signed an arbitration agreement with the prospective defendant.  Plaintiff's answer to this question was "no."  A true and correct redacted copy of this Intake Questionnaire is attached hereto as **Exhibit 1**. *See* Exhibit 1, at 2.

---

[1] Defendant has also submitted its two sanctions motions against Plaintiff but has represented to this Court that it is either attempting to resolve them without the need for any opposition, or that it has resolved them as against Plaintiff presumably based on a settlement.  Thus, as explained below, despite the fact that it was Plaintiff herself who initially refused to consent to arbitration over our Firm's advice and thereby caused us to withdraw, Defendant evidently now seeks sanctions *only* against the Firm and Counsel - - and not against Plaintiff - - due to Plaintiff's own personal refusal to consent to arbitration at an earlier stage in this litigation.

7.     Plaintiff did not immediately retain the Firm's services after her December 27, 2017 consultation.  Rather, after nearly one month of back-and-forth between Plaintiff and the Firm, Plaintiff ultimately did retain the Firm's services on January 26, 2018, by executing a retainer agreement with the specific and limited purpose as follows:

> To represent Client in pursuit of a claim for damages arising out [of her employment with] Mirador Real Estate and/or related entities/ individuals by attempting to conduct settlement negotiations and by completing all work that the Firm deems necessary to attempt to conduct those negotiations.  ***Firm is not obligated*** by this Agreement to prosecute any . . . ***litigation***, appeal or retrial on Client's behalf.  ***Any additional claims or controversies will require the Client to enter into a new retainer agreement.***

(Emphasis added).  A true and correct redacted copy of Plaintiff's initial January 26, 2018 retainer agreement with the Firm is attached hereto as **Exhibit 2**.

8.     Following execution of Plaintiff's initial retainer agreement, Plaintiff provided the Firm with over 185 pages of documents and evidence in support of her claims.  After reviewing these materials and discussing them with Plaintiff, the Firm drafted a demand letter that it sent on February 27, 2018, (hereinafter "Demand Letter") to Defendant MIRADOR REAL ESTATE, LLC, via first class and electronic mail, addressed to Ms. Karla Saladino, Defendant's Managing Partner.  A true and correct copy of Plaintiff's Demand Letter, along with the transmittal email, is attached hereto as **Exhibit 3**.

9.     Besides explaining the basis for her claims, Plaintiff's Demand Letter also asked Defendant to provide a "full and complete copy of [Plaintiff's] personnel file. . . ." Exhibit 3 at 3. Further, "[i]n conjunction with that request," the Demand Letter also **explicitly requested** that Defendant "immediately produce any agreement that the [Defendant] contends contains alternative dispute resolution procedures that would govern the claims described herein." *Id*. at 4.

3

10.     Defendant did not respond to Plaintiff's Demand Letter.  Thus, on March 15, 2018, the Firm sent a litigation preservation letter ("Preservation Letter") to Defendant, again via first class and electronic mail, also including another copy of Plaintiff's Demand Letter, and again reiterating a request for any alternative dispute resolution procedures that would govern Plaintiff's claims.  A true and correct copy of Plaintiff's Preservation Letter and transmittal email regarding the same is attached hereto as **Exhibit 4** (request for alternative dispute resolution procedures found at page nine).

11.     On March 21, 2018 at 6:58 p.m., Defendant responded to Plaintiff's Demand Letter and Preservation Letter via email from Ms. Saladino.  In that response, Ms. Saladino briefly wrote that she "checked on [Plaintiff's] paperwork and [she] was at will and exempt – she also never hit any bonus level.  Let me know if you need anything further."  Ms. Saladino's note said nothing about any alleged arbitration agreements or alternative dispute resolution program(s).  A true and correct copy of Defendant's email response is attached hereto as **Exhibit 5**.

12.     Within two minutes, undersigned counsel responded to Ms. Saladino's email, pointing to Plaintiff's allegations that she was "unlawfully classified as exempt, and [that] she did in fact earn commissions that were unpaid."  Further, our email to Ms. Saladino asked "whether you will be providing any further response to [Plaintiff's] letter[s], or if you will be hiring counsel to respond.  **If neither, we will prepare her complaint for filing *in federal court*.**"  A true and correct copy of our March 21, 2018 7:00 p.m. email response to Ms. Saladino is attached hereto as **Exhibit 6** (emphasis added).

13.     Immediately upon sending our response to Ms. Saladino's email, undersigned counsel received an "Undeliverable" message from Microsoft Outlook, stating "Your message wasn't delivered . . . it may have been rejected by a moderator . . . ."  The "Undeliverable" message

also indicated that our email was treated as "spam" using a Microsoft Outlook code number "5.7.1." It is our understanding that the message could only have been "rejected" if Defendant had actually blocked the Firm's (or undersigned counsel's) email URL domain address from receiving emails, or designated the same as "spam" and blocked the Firm's domain. A true and correct copy of this "Undeliverable" message is attached hereto as **Exhibit 7**. *See* Email non-delivery reports in Office 365, Support.Office.com, "NDR Code 5.7.1," https://support.office.com/en-us/article/email-non-delivery-reports-in-office-365-51daa6b9-2e35-49c4-a0c9-df85bf8533c3 (last accessed Nov. 2, 2018).

14.     Three minutes later, we again attempted to send a response to Ms. Saladino to test whether the initial "Undeliverable" message was merely a glitch. However, we received an identical "Undeliverable" message in response to this follow-up email. The next day, March 22, 2018, we again attempted to email Ms. Saladino, and again received a third "Undeliverable" message. A true and correct composite exhibit of these subsequent follow-up emails and "Undeliverable" messages is attached hereto as **Exhibit 8**.

15.     With Defendant obviously declining to respond or engage in any substantive dialogue in response to Plaintiff's Demand and Preservation Letters, the Firm offered Plaintiff a new retainer agreement with the specific purpose of prosecuting her claims through litigation. The Firm prepared and sent Plaintiff a revised litigation retainer agreement on March 26, 2018. Once again, however, Plaintiff did not immediately execute and return the retainer, and instead sought the opinion of a trusted friend and Administrative Law Judge, Ms. Susan Smith, to review the revised retainer before executing. Plaintiff explained to us by phone, in sum and substance, that she is always apprehensive and cautious when signing legal documents, and that she generally seeks a second opinion before signing such documents.

16.     Plaintiff's revised litigation retainer was ultimately executed on April 3, 2018.  A true and correct redacted copy of Plaintiff's executed litigation retainer is attached hereto as **Exhibit 9**.

17.     The Firm then prepared Plaintiff's complaint alleging various claims for unpaid wages and retaliation under the Fair Labor Standards Act and New York Labor Law, as well as a claim under the Internal Revenue Code, 26 U.S.C. § 7434(a), arising from an allegedly fraudulent IRS Form W-2 that Defendant sent to Plaintiff following her termination.  We filed Plaintiff's complaint on May 4, 2018. ECF # 1.  We served Defendant with Plaintiff's complaint on June 1, 2018. ECF # 7.

18.     On June 13, 2018, undersigned counsel received a phone call from Mark Goldberg, Esq., of the law firm Loeb & Loeb, LLP, attorney for Defendant.  During that call, Mr. Goldberg requested an extension of time to answer or otherwise respond to Plaintiff's complaint, and also made reference to an alleged arbitration agreement between Plaintiff and Defendant.  Mr. Goldberg asked whether Plaintiff would consent to withdraw her complaint entirely and instead proceed to arbitration.  I responded that I would gladly review any alleged agreement and discuss the same with my client, but that in the event that there was indeed a valid arbitration agreement, the correct procedure would be to consent to a stay of the proceedings pursuant to *Katz v. Cellco Partnership*, 794 F.3d 341, 344-347 (2d Cir. 2015), not dismiss the action.  He and I then followed up via email, wherein Mr. Goldberg forwarded me the alleged arbitration agreement, and a proposed stipulation to extend Defendant's answer deadline.  A true and correct copy of that email exchange and its attachments is attached hereto as **Exhibit 10**.

19.     Also on June 13, 2018, the Court so-ordered a stipulation between counsel for all parties to extend Defendant's deadline to answer, move, or otherwise respond to Plaintiff's Complaint through and including July 13, 2018. ECF # 8.

20.     That same day, we forwarded the alleged arbitration agreement to Plaintiff, asking her to confirm: (a) whether she had ever seen the document before; and (b) whether her signature was found on the last page.  Plaintiff responded shortly thereafter that same afternoon stating: "I have never seen this document before.  I keep records of everything and certainly would have had a copy of a 10 page agreement.  I can't say for certain if that's my signature, but I can tell you I was not given a 10 page arbitration agreement.  Also, the counter signature is not a familiar name." In response, we asked whether Plaintiff ever signed a single-page document containing only a signature line - - as the alleged arbitration agreement's signature page has no substantive text on the signature page, raising an immediate red flag as to the possibility that it may have been inserted into this document in an attempt to create a forged agreement.  Plaintiff responded that this was indeed possible, and that she "wouldn't put anything past them, including forgery."  Plaintiff also reiterated to us that we should "know that a 10 page document of this nature would have made me nervous. I would have asked a confidant for their opinion before signing it."  This response was indeed consistent with Plaintiff's own previous practice before executing her two retainer agreements with the Firm, leading undersigned counsel to find Plaintiff's statement credible.  A true and correct copy of this email exchange with Plaintiff is attached hereto as **Exhibit 11**.

21.     After Plaintiff unequivocally denied having received and executed the alleged arbitration agreement, the Firm unilaterally undertook a metadata analysis of the electronically stored information contained in the .PDF file that Mr. Goldberg had sent.  A true and correct copy of this metadata analysis is attached hereto as **Exhibit 12**.

22.     This analysis appeared to reveal that the .PDF file was created on Saturday, June 9, 2018, and was subsequently altered on June 13, 2018, shortly before Mr. Goldberg sent the alleged agreement to our Firm. *See* Exhibit 12 at 1.   Further, the analysis appeared to reveal that encoding for each of the first nine pages of the document (i.e., pages without any handwritten text or signatures) differed from the encoding of the tenth and final page of the document (i.e., the page containing the alleged signatures). *See id.* at 2-5.   Similarly, the first nine pages were prepared as gray-scale images while the tenth and final page was prepared as a color image. *Id.*   These electronic indicators, coupled with the above-referenced red-flag that the signature page itself did not contain any substantive text, combined to lead us to seriously question the legitimacy of the alleged arbitration agreement.

23.     We shared our concerns with Defendant's counsel via email on June 25, 2018, forwarding the same to Plaintiff immediately thereafter.   A true and correct copy of this email is attached hereto as **Exhibit 13**.

24.     Notably, in this June 25th email, **we unequivocally confirmed that**: "my client denies having ever received the document that your client claims to be her arbitration agreement." *Id.*   We did not represent that Plaintiff simply did not "remember" receiving it. *See id.*   We also confirmed that Plaintiff:

> [E]xpressly denies having ever received the document to sign as part of her employment, specifically noting that had she been asked to sign a ten-page document, she would have sought advice - - either from friends, colleagues, or counsel - - before executing it . . . [i]ndeed, even before inquiring with my client as to whether or not she had signed the document, I found it very odd that there would be a signature page with nothing at all listed above it on the final page.

*See id.* at 1-2.   Also as part of that email exchange with Defendant's counsel, we included Plaintiff's alleged damages - - for settlement purposes only - - in an effort to ascertain whether Defendant was interested in discussing a potential early mediation. *Id.* at 3.

25.     Defendant's counsel responded on June 28, 2018, by forwarding us a series of emails with voluminous attachments forwarded to him from Defendant.   Those emails and attachments are attached hereto as a single composite exhibit as **Exhibit 14**.   One of the attachments to the June 28th emails is another version of the alleged arbitration agreement allegedly executed by Plaintiff, but also countersigned by a different individual than the countersignature originally produced by Defendant on June 13, 2018. *Compare* Exhibit 14 at 22 (Leslie Zemnick, countersigner), *with* Exhibit 10 at 13 (Jose Berrios, countersigner, ostensibly same document).

26.     In response to our concern about this deeply troubling disparity and seemingly on-its-face confirmation that the alleged agreement was indeed fraudulent, Defendant's counsel explained Defendant's justification for the disparity over the phone, also on June 28, 2018. Defendant's counsel also claimed to have evidence contradicting the merits of Plaintiff's complaint, and promised to provide that information to the Firm in the coming days.   Specifically, Defendant's counsel explained as follows:

a.     Leslie Zemnick, Defendant's then-Director of Operations, provided the documents in Exhibit 14 - - including the alleged arbitration agreement - - to Plaintiff during the initial period of her employment on April 20, 2017.   According to Zemnick, Plaintiff requested to take the documents home with her to review them.

b.      On April 24, 2017 at 11:18 a.m., Defendant sent an email Zip file to Plaintiff with the arbitration agreement and other documents attached.   Defendant provided this email and Zip file in Exhibit 14 at page 22.

c.      According to Defendant, Plaintiff signed the documents that same day, which were scanned into Defendant's files at 1:19 p.m. also that same day. *See* Exhibit 14 at 43.

d.      A few moments later at 1:22 p.m. also on that same day, Defendant forwarded Plaintiff's signed documents via email to Jose Berrios, Defendant's third-party human resources administrator, and principal of PanAm Equities.   The email from Ms. Zemnick to Mr. Berrios is included in Exhibit 14 at page 55.

e.      The documents forward to Mr. Berrios only contained Plaintiff's signature - - i.e., the documents were not counter-signed.

f.      Mr. Berrios then counter-signed the documents upon receipt, which is the countersignature on the original alleged arbitration agreement Defendant produced to the Firm via Exhibit 10 at page 13.

g.      Ms. Zemnick also retained an original of Plaintiff's executed documents on-site at Defendant's offices, and she also counter-signed the documents - - explaining why there were two different versions of the documents with two different individuals countersigning the same below Plaintiff's signature.

h.      With respect to the metadata issues the Firm addressed and identified, Defendant's counsel explained that Defendant's office scanner "automatically converts text and text/image pages based on whether there's text-only or text plus images" (e.g., a

signature) in the scanned document, while also converting the same to black-and-white or color depending on the nature of the document.

27.     This explanation provided by Defendant's counsel on June 28, 2018 is consistent with the October 23, 2018 Declaration of Leslie Zemnick, submitted by Defendant in support of its motion to dismiss. *See generally* ECF # 21.

28.     From July 2, 2018 through July 6, 2018, undersigned counsel and Defendant's counsel corresponded regarding our shared unavailability to resolve the identified disputes regarding the alleged arbitration agreement due to the Independence Day holiday, and ultimately agreed to extend Defendant's deadline to answer or otherwise respond to Plaintiff's complaint.  At the time, Defendant had not yet submitted to us any alleged evidence contradicting Plaintiff's complaint, nor had Defendant begun working on any motion to compel arbitration.  A true and correct copy of this email thread is attached hereto as **Exhibit 15**, with the agreement to extend Defendant's deadline found on page 1 of the same.

29.     On July 6, 2018, the parties then executed a second stipulation extending Defendant's answer or response deadline to August 8, 2018, which this Court so-ordered on July 9, 2018. ECF # 9.

30.     Following the holiday, after taking sufficient time to carefully review all the materials Defendant submitted to us on June 28, 2018 (i.e., Exhibit 14), we forwarded the same to Plaintiff on July 24, 2018.  Our email to Plaintiff also included undersigned counsel's personal notes from our call with Defendant's counsel, which are summarized above, wherein he explained the rationale behind Defendant's position with respect to the alleged arbitration agreement. Plaintiff responded on July 30, 2018, stating that she did not "recall signing anything that was more than 1 page."  In response, we counseled Plaintiff as follows:

> What I need to know from you - - one way or another - - is whether
> you confirm, deny, or do not recall signing the documents.  If you
> do not recall, that's going to be difficult to overcome and we may
> likely go to arbitration.  If you confirm, then we'll be going to
> arbitration.  If you deny, then we will have a mini-trial on our hands
> to avoid arbitration.  I just need a clear answer from you one way or
> another.

In response to this specific directive, Plaintiff stated - - unequivocally and succinctly - - "**I did not**

**sign these documents**."   A true and correct copy of this email thread is attached hereto as **Exhibit**

**16** (emphasis added).

31.     The following day, on August 1, 2018, undersigned counsel spoke with

Defendant's counsel to share - - again - - Plaintiff's unequivocal denial of having ever received or

executed the alleged arbitration agreement.  We also discussed the prospect of scheduling an in-

person meeting wherein we and Plaintiff could personally review the alleged original arbitration

agreement.  Finally, we also agreed to extend the deadline for Defendant's answer or motion to

compel arbitration once again.

32.     On August 2, 2018, the parties mutually submitted an agreed-upon third stipulation

extending Defendant's answer or motion deadline until September 7, 2018, ECF # 10, which the

Court so ordered on August 13, 2018. ECF # 11.

33.     Also on August 13, 2018, undersigned counsel and Plaintiff - - accompanied by

Plaintiff's husband - - traveled to Defendant's counsel's law offices to review the hard copy alleged

originals of the alleged arbitration agreement.   After reviewing the alleged originals, Plaintiff

shared with undersigned counsel once again that she **never received** the documents, and that she

never signed any documents as complex and lengthy as the alleged agreements provided by

Defendant's counsel.  I advised Plaintiff that day that if she endeavored to challenge the legitimacy

of Defendant's alleged arbitration agreement, it would result in a lengthy delay in adjudicating the

merits of her claims, and that there were many risks associated with her efforts if they proved unsuccessful, including damaging her credibility, and eliminating certain funds that Defendant might otherwise be interested in devoting to settlement rather than prosecution of this procedural, preliminary motion.  To this final point, I broached the possibility of obtaining authority from Plaintiff to convey a settlement demand and explore potentially conducting a mediation to attempt to resolve this matter in its entirety.  At the conclusion of the meeting, Plaintiff explained that she would consider the Firm's advice, discuss the same with her husband, and notify us of her decision.

34.     Three weeks later, on September 4, 2018, Plaintiff wrote to undersigned counsel, stating that: "[a]fter careful consideration I believe only a judge could fairly resolve this matter and I want to go to court.  I'm done wasting time. . . **I believe our meeting with Attorney Goldberg was a farce.  The documents are fraudulent**; the only objective of that meeting was to evaluate my credibility and demeanor. . . [p]lease advise me as how we will go forward."  A true and correct copy of this email exchange is attached hereto as **<u>Exhibit 17</u>** (emphasis added).

35.     That same day, undersigned counsel spoke with Defendant's counsel and again stated that Plaintiff denies having received or signed the alleged arbitration agreement, and again discussed an additional stipulation to extend Defendant's deadline to answer or move to compel arbitration.  The parties executed a fourth mutually agreed-upon stipulation, which the Court so-ordered on September 6, 2018, which extended Defendant's time to do so until September 28, 2018. ECF # 13.

36.     Also on September 4, 2018, Defendant then submitted to us their alleged "evidence" and a letter explaining the same regarding the merits of Plaintiff's complaint - - first referenced more than two months earlier on June 28, 2018.[2] *See* Paragraph 23, *supra*.

---

[2] While the content of Defendant's claimed "evidence" is not at issue here, Defendant's submission did not alter our analysis of the merits of Plaintiff's claims, as Plaintiff's nearly 200-page submission to us at the

37.     Undersigned counsel subsequently spoke to Plaintiff on September 14, 2018, **recommending strongly** that she consent to proceed to arbitration given the serious, though potentially ***not*** insurmountable, hurdles she faced if she chose to oppose Defendant's forthcoming motion to compel arbitration.   Namely, we explained: Defendant's arguably plausible explanation for having two seemingly original copies of the alleged arbitration agreement with two separate countersignatures; Defendant's also plausible explanation for the metadata issues our Firm identified during our initial metadata analysis; and that the emails Defendant forwarded to us (i.e., Exhibit 14) would require us to seek expert witness analysis to determine if it would even be possible to refute the account provided by Defendant - - that Plaintiff signed the documents on April 24, 2018, and Defendant then forwarded the same to its third-party human resources administrator.

38.     During this call, I also shared that Defendant had threatened to move for sanctions if Plaintiff opposed Defendant's forthcoming motion for arbitration.

39.     Finally, I also explained that I was attempting to forward to Plaintiff the materials received on September 4, 2018 relating to the merits of Plaintiff's claims, but that I was experiencing technical difficulties.   That same day, following our conversations, we emailed with Plaintiff to attempt to forward her the materials, which again encountered a technical error when attempting to transmit the same.   We were ultimately able to forward the materials to Plaintiff via a secured hyperlink on September 15, 2018.   A true and correct copy of the email thread explaining this exchange is attached hereto as **Exhibit 18**.

40.     Following our Firm's efforts to convince Plaintiff to consent to arbitration, undersigned counsel reached out to Defendant's counsel via email on September 17, 2018, to

---

very outset of this matter created more than ample support of her claims that Defendant paid her unlawfully, in violation federal and state law.

advise that we were attempting to obtain authority from Plaintiff to consent to arbitration. That email exchange continued through September 21, 2018, where Defendant's counsel stated "[Defendant's] response is due next Friday. I'll need a response tomorrow, ***or another adjournment to allow time to draft a motion to compel, if needed***." A true and correct copy of this email exchange is attached hereto as **<u>Exhibit 19</u>**.

41.     Concurrently with this exchange between counsel, undersigned counsel had attempted to reach Plaintiff by phone throughout the week of September 17th, but Plaintiff had not responded to our calls or messages. We then emailed Plaintiff on September 21, 2018 to present her with three options for moving forward. The first involved attempting to settle her case before Defendant filed its motion to compel arbitration. The second involved litigating the motion to compel arbitration, but with the caveat that - - because Plaintiff has made the decision to decline our Firm's advice and counsel on a material matter relating to the representation (i.e., to consent to proceed to arbitration) - - we would require a new retainer agreement wherein Plaintiff would pay the legal fees ***and*** expenses out of pocket associated with defending against the arbitration motion, which would require expert testimony to do, and which could only be accomplished if an expert agreed that the arbitration agreement was fraudulent.[3] We explained that the expenses associated with this option would be substantial, and would require a retainer payment of $15,000.00 to enable us to begin working on this and consulting with the necessary - - and

---

[3] These attempts to obtain expert witness testimony / evidence in support of Plaintiff's position is what underlie the Firm's previous representation in our motion to withdraw with respect to any potential "ethical" issues associated with continuing the Firm's representation. *See* ECF # 16-1, ¶ 16. We had no doubt that by hiring expert witnesses - - both a handwriting expert and an electronic file expert to analyze metadata discrepancies - - we would have ample ethical and evidentiary support to advocate Plaintiff's position with respect to the arbitration question. However, absent authority from Plaintiff to hire such expert witnesses, the sole claim to rebut Defendant's arbitration argument was Plaintiff's own denial.

expensive - - expert witness or witnesses as soon as possible.[4]  The third option - - if Plaintiff was neither interested in attempting to negotiate a resolution, nor interested in a new retainer arrangement to determine if there was an expert-witness-based evidentiary basis to oppose Defendant's motion, and to actually oppose the motion if there were, nor interested in simply consenting to arbitration - - would be for the Firm to withdraw from the matter as counsel of record. A true and correct copy of this email is attached hereto as **Exhibit 20**.

42.     Both prior and subsequent to the email attached as Exhibit 20, undersigned counsel, Plaintiff, and Michael J. Borrelli, Esq. (the Firm's managing partner), engaged in a lengthy email exchange from September 17, 2018 through September 25, 2018.  A true and correct copy of this email thread is attached hereto as **Exhibit 21**.  In brief, throughout this email exchange, the relationship between Plaintiff and the Firm began to break down beyond the point of repair (which is what led to the Exhibit 20 email, above, noting our proposal to potentially withdraw).  We also explained the necessary procedure and evidence we would need to adduce for Plaintiff to have a good faith basis to oppose Defendant's motion to compel arbitration. *See id.* at 13-14.  Importantly, we also emphasized that we had concerns that we may not be able to ethically advance Plaintiff's argument against the alleged arbitration agreement absent specific evidence to support Plaintiff's fraud-based argument, which is why it was imperative for the Firm to hire expert witnesses to determine if there was any support for her theory by both analyzing the handwriting in the relevant documents, and conducting a thorough document comparison and metadata analysis beyond the initial analysis that the Firm conducted at the outset of this matter. *Id*. at 13-14.

43.     In response, Plaintiff questioned "why it was so imperative for me to send several emails to you, stating no arbitration," *see* Exhibit 21 at 4, and also questioned why we provided

---

[4] This appears to have been the source of Defendant's apparent misunderstanding of our prior communication with Plaintiff, as set forth in Defendant's March 6, 2019 letter (ECF # 36).

any further extensions of time to Defendant. *Id.*  Plaintiff did not comment on the Firm's ethical concerns with respect to Plaintiff's stated position in opposition to Defendant's forthcoming motion to compel arbitration.

44.    On September 24, 2018, undersigned counsel confirmed with Defendant's counsel that we would indeed execute another stipulation to extend Defendant's response deadline. Thereafter, on September 26, 2018, the parties executed a final stipulation extending Defendant's answer or motion deadline until October 24, 2018, ECF # 14, which the Court so-ordered on October 1, 2018, ECF # 15.

45.    As Mr. Borrelli explained to Plaintiff, the basis for this final extension was necessary to "straighten out whether or not we are representing you going forward [ ].  With that issue up in the air we certainly didn't want [Defendant] to file their motion for arbitration before you had a chance to look for new counsel." *See* Exhibit 21 at 1.

46.    On September 27, 2018, in a last-ditch-effort to salvage the Firm's attorney-client relationship with Plaintiff, undersigned counsel and Mr. Borrelli conducted a telephone conference with Plaintiff to discuss her options for moving forward.  During that call, the Firm presented Plaintiff with a new fourth option to enter into a new retainer agreement with the Firm on terms different than those proposed in Exhibit 20.  Specifically, rather than offer Plaintiff an hourly-fee retainer agreement, the Firm offered to *continue* a contingent-fee-based retainer, but with the requirement that Plaintiff pay up-front expenses related to her opposition to Defendant's motion to compel arbitration in advance of their incursion, specifically relating to hiring expert witnesses. In response, Plaintiff notified the Firm that she was consulting with potential replacement counsel and would respond to us as soon as she could.  A true and correct copy of the email wherein Plaintiff explained that she was seeking new counsel is attached hereto as **Exhibit 22**.

47.     While Plaintiff considered her options, on October 8, 2018, Defendant served a Rule 11 letter and notice of motion threatening sanctions against Plaintiff, undersigned counsel, and the Firm.  A true and correct copy of the letter, a notice of motion, and the accompanying transmittal email is attached hereto as **Exhibit 23**.

48.     On October 16, 2018, Plaintiff wrote to undersigned counsel that "I feel confident in your original decision to pursue going to court . . . [o]ur retainer agreement stands on its face and should not be altered."

49.     In response, on October 18, 2018, we forwarded Defendant's Rule 11 letter and notice of motion to Plaintiff, explained that we were attempting to obtain quotes from a potential handwriting expert witness, and confirmed our prior proposal that Plaintiff would make payment on expenses related to opposing the motion to compel arbitration in advance of when they became due.  We also requested her authority to extend the deadline for Defendant's motion one final time as we attempted to retain an expert and as we worked out how the costs for retaining the same would be paid.  A true and correct copy of this email exchange is attached hereto as **Exhibit 24**.

50.     Also on October 18, 2018, we obtained a quote for a potential handwriting and document analysis expert, which we forward to Plaintiff that same day.  Specifically, the potential expert charged the following rates: $1,500.00 for an initial signature examination; $250.00 for each additional questioned signature of the same name; $1,500.00 to examine handwriting other than a signature; $250.00 per hour for document examinations; $1,000.00 for a comprehensive written report with demonstrative exhibits; and a minimum of $2,000.00 for in-person appearances.  We explained to Plaintiff that based on these rates, a fair estimate for his services would be somewhere between $10,000.00 and $15,000.00.  We also forwarded to Plaintiff a revised retainer agreement which explained that Plaintiff was required to advance costs relating to

opposing the motion.  A true and correct composite exhibit of these two emails and documents, including the potential expert's fee schedule, is attached hereto as **Exhibit 25**.

51.     On October 20, 2018, we again followed up with Plaintiff to confirm that she would indeed be signing the new retainer - - originally discussed on September 27, 2018 and forwarded to her on October 18, 2018.  In response, Plaintiff stated that she would not be signing another agreement as she believed doing so "was unethical."  A true and correct copy of this email exchange is attached hereto as **Exhibit 26**.

52.     Finally, on October 22, 2018, based on Plaintiff's unwillingness to expend the necessary resources to hire expert witnesses to attempt to support her argument with respect to the alleged arbitration agreement, and after extensively explaining to her that expert testimony - - or some evidence beyond her own denials - - was crucial to challenging the forthcoming motion, our Firm was left with no choice but to file our motion seeking leave to withdraw as counsel of record. *See* ECF # 16, 16-1.  On October 26, 2018, the Court ordered the Firm "to submit *ex parte* a letter detailing counsel's dispute with Plaintiff." ECF # 22.  On November 2, 2018, the Firm submitted to the Court its *ex parte* letter with twenty-seven exhibits, further explaining the substantive dispute between Plaintiff and the Firm.

53.     Notably, the twenty-one day safe-harbor provision associated with Defendant's Rule 11 threat did not expire until October 29, 2018 - - a full seven days after the Firm moved to withdraw.

54.     Nonetheless, as the Court knows, despite our Firm moving to withdraw well within the twenty-one day safe-harbor period, Defendant filed two separate motions for sanctions.

55.     On October 24, 2018, Defendant filed its first motion for sanctions - - combined with its motion to dismiss Plaintiff's complaint and to compel arbitration under the Federal

Arbitration Act - - seeking sanctions based upon 28 U.S.C. § 1927 and the Court's inherent authority. ECF #s 18-20.  On October 29, 2018, Defendant filed its second motion for sanction, premised upon alleged violations of Rule 11 of the Federal Rules of Civil Procedure. ECF #s 23-25.

56.     These motions *grossly* misrepresented the history of the parties' negotiations and procedural history extensively detailed above, including by stating that "[t]he only reason given by Mr. Minkoff for Ms. DeFrancesco's refusal to arbitrate was that she does not recall signing the ADR Program," and instead patently falsely arguing that the only basis for Plaintiff's refusal to consent to arbitration is because "she does not recall signing the ADR Program." *See* ECF # 19 at 9, 12; ECF # 24 at 5.

57.     Again, Defendant also filed its second motion for sanctions under Rule 11 despite our Firm filing our motion to withdraw within Rule 11's twenty-one-day safe-harbor provision. *Compare* Exhibit 23 (dated October 8, 2019), *with* ECF # 16 (dated October 22, 2018, i.e., fourteen days later).

58.     We then forwarded Defendant's first motion to Plaintiff, as well as this Court's October 26, 2018 Order directing us to confer with Plaintiff and determine whether (a) she would be hiring new counsel, and (b) if she opposed our request to withdraw.  Moreover, in our October 24, 2018 email to Plaintiff forwarding her Defendant's first motion to dismiss and sanctions, we notified Plaintiff that "given our [Firm's] pending motion to withdraw and the reasons behind our filing of the same, we will only be responding to the portions of Defendant's motion that pertain to our [F]irm."  Via that same email, we also notified Plaintiff that we would seek an extension of time on her behalf to respond to the motion until after our motion to withdraw was decided if she

requested us to do so.  A true and correct composite exhibit containing these emails is attached hereto as **Exhibit 27**.

59.      Undersigned counsel also called Plaintiff on November 1, 2018 to follow-up again and ask whether she opposed our motion to withdraw and whether she would be hiring new counsel.  Plaintiff did not answer her phone; after leaving her a voicemail, she did not return our call.

60.      On November 2, 2018, Plaintiff responded to our emails provided in Exhibit 27 to state that she is opposing our motion to withdraw.  She did not state whether or not she would obtain new counsel if our motion to withdraw was granted.

61.      Also on November 2, 2018, we served Plaintiff with a copy of our *ex parte* letter and exhibits, via email.  A true and correct copy of the November 2nd service email is attached hereto as **Exhibit 28**.

62.      On November 9, 2018, the Court granted the Firm's motion to withdraw as Plaintiff's counsel of record, also directing the Clerk to keep our Firm's status in the matter as active on the ECF docket "so that Borrelli may electronically file a response to Defendant's pending motions for sanctions, *should I deem such a response necessary.*" *See* ECF # 26 (emphasis added).

63.      On January 10, 2019, Plaintiff requested additional time to obtain new counsel. ECF #s 28, 29.  Plaintiff's new counsel, Thomas Anthony Ricotta, Esq., appeared on her behalf in this matter on February 28, 2019. ECF # 30.

64.      On March 1, 2019, the Court entered an order directing the parties and the Firm to meet and confer with respect to a briefing schedule on Defendant's pending motions. ECF # 31.

65.     That same day, the Firm submitted a letter to the Court requesting clarification as to whether or not the Court required a submission in opposition to Defendant's motions for sanctions against the Firm and undersigned counsel "in light of the materials we originally submitted to the Court *ex parte* in support of our motion to withdraw." ECF # 32.

66.     On March 6, 2019, Defendant responded to our March 1st letter by stating that Defendant "has information contrary to what [Borrelli's] papers *presumably* say. . . . [b]ased on [Mr. Minkoff's] statement [in the Firm's October 22, 2018 letter], it appears that Borelli's [sic] *ex parte* papers state that Plaintiff, over Borrelli's alleged legal advice, refused to arbitrate her claims . . . . However, *I have been advised by Plaintiff's current legal counsel that it was Borrelli, not Plaintiff, that insisted on keeping Plaintiff's claims in federal court and that Borelli [sic] recommend that Plaintiff arbitrate her claims only after the sanctions motion was filed.*" ECF # 33 at 1 (emphasis added).

67.     On March 11, 2019, undersigned counsel spoke with Plaintiff's new counsel, Mr. Ricotta, to confirm whether Defendant's counsel's March 6th representations as to Mr. Ricotta's statements were indeed true, and to meet-and-confer to prepare a briefing schedule for Defendant's pending motions to dismiss and for sanctions.  Mr. Ricotta did not deny Defendant's counsel's representation.  In response, also as part of that call, I asked Mr. Ricotta whether he had ever even reviewed the voluminous materials that we submitted along with our *ex parte* correspondence to this Court in support of our motion to withdraw which - - as set forth in extensive detail above - - flatly disprove Defendant's March 6th assertion.  In response, Mr. Ricotta confirmed that he had *not* ever reviewed the materials we previously submitted to the Court because he was not in possession of them, meaning Plaintiff never provided them to him, and I then sent the same to him via email at his request immediately thereafter on that very same day.  A true and correct copy of

the email to Mr. Ricotta, transmitting to him the originally submitted *ex parte* materials, is attached hereto as **Exhibit 29**.

68.     During the March 11th call, Mr. Ricotta also explained that he was agreeing to withdraw Plaintiff's complaint and proceed with arbitration, and that he was negotiating a potential resolution of the motion for sanctions as to Plaintiff only, and potentially a resolution of the matter in its entirety as to Plaintiff only.

69.     That same day, I also spoke with counsel for Defendant, Mr. Goldberg, and inquired as to whether Defendant would still be proceeding with its two motions for sanctions against the Firm and myself.  I also advised that his representations in his March 6th letter were grossly and demonstrably inaccurate.  Defendant's counsel confirmed that Defendant would indeed proceed with its two sanctions motions against the Firm and me.  I responded by notifying Mr. Goldberg that - - besides the baseless factual grounding of Defendant's motion - - Defendant's Rule 11 motion was procedurally frivolous given our efforts to withdraw during the safe-harbor period.  I further directed Defendant's counsel's attention to Rule 11(c)(2), which provides for an award of reasonable attorneys' fees and costs to a *prevailing party* on a Rule 11 motion - - including a non-movant.  Mr. Goldberg responded that Defendant would be proceeding with its motions against the Firm and me in any event.

70.     On March 14, 2019, Defendant filed a letter notifying the Court that Plaintiff - - through her new counsel - - now *agreed* to dismiss her complaint "with prejudice to file her claims in court, but without prejudice for her to file such claims in arbitration."  At the same time, "Plaintiff and [Defendant] are engaging in settlement discussions which may moot the motion as to Plaintiff (*but not as to her former counsel*)." ECF # 36 at 1 (emphasis added).

71.     On May 3, 2019, Defendant and Plaintiff submitted a stipulation dismissing all claims against Defendant "with prejudice to refile such claims in any court, but without prejudice to file such claims in arbitration." ECF # 39.

72.     Though it was not necessary to do so given RPC 1.6(b)(5)(i)'s permissive waiver of typical client confidences under present circumstances, on March 12, 2019, we sought, through Mr. Ricotta, Plaintiff's consent to submit the materials contained herein on the public docket, given the evident misrepresentations that appeared to have been made - - either by Defendant's counsel, or by Plaintiff's new counsel, as set forth in the March 6th letter.  Three weeks later, on April 2, 2019 - - for reasons that seem obvious given that the contemporaneous factual materials fully demonstrate that it was Plaintiff who refused to arbitrate over our advice - - Mr. Ricotta advised that Plaintiff was refusing to consent to our presentation of these materials to the Court and Defendant's counsel on the public docket.  Nonetheless, RPC permits us to file these materials without her consent.[5]  A true and correct copy of the email correspondence confirming this exchange is attached hereto as **Exhibit 30**.

73.     All legal arguments explaining why the Court should flatly deny Defendant's motion and award us our attorneys' fees for having to oppose it pursuant to Rule 11(c)(2) are contained in the Firm and Counsel's Memorandum of Law in Opposition to Defendant's Motions for Sanctions Against Borrelli & Associates, P.L.L.C. and Michael R. Minkoff, Esq., filed contemporaneously herewith.

---

[5] The Firm has redacted portions of these materials - - to the greatest extent possible - - where said redactions are not material to the issues relevant in this briefing, and/or where they involve strategy with respect to the merits, discovery, or negotiations.

74.     We thank the Court for its time and attention to this matter.


Dated:  New York, New York
        May 3, 2019

                                        Respectfully submitted,


                                        _____
                                        MICHAEL R. MINKOFF (MM 4787)